UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
RAY HODGE,

                    Plaintiff,          05 Civ. 7622 (LAK)(DFE)

        - against -                     (This is not an ECF case)

                                        REPORT
COLUMBIA UNIVERSITY IN THE CITY OF      AND RECOMMENDATION
NEW YORK / OFFICE OF INSTITUTIONAL      TO JUDGE KAPLAN
REAL ESTATE; and THE TRUSTEES OF
COLUMBIA UNIVERSITY IN THE CITY OF
NEW YORK,

                    Defendants.
----------------------------------x

DOUGLAS F. EATON, United States Magistrate Judge.

        Plaintiff Ray Hodge alleges that his former employer, The

Trustees of Columbia University in the City of New York [1]

("Columbia"), discriminated against him because of his age, race

and color.  He alleges that Columbia subjected him to harassment

and undeserved discipline.  He invokes the Age Discrimination in

Employment Act, 29 U.S.C. §§ 621-634, and Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

Hodge proceeded pro se in our Court from August 29, 2005 until

December 19, 2007, when a Notice of Appearance was served by

Pamela D. Hayes, Esq.

        On October 20, 2005, Columbia filed its Answer.  I held an

initial case management conference on November 8, 2005.  At that

time, at the request of both parties, I issued an order staying

---

        [1] This is the second of two names listed by Hodge in the caption of the
Complaint.  Defense counsel states that this second name is the proper name of
Hodge's employer. (12/13/07 Def. Mem. p. 1.)  In essence there is only one
defendant.

all proceedings in this lawsuit until the parties could complete an extensive arbitration proceeding. That was an arbitration of grievances filed against Columbia by Hodge through his union, Local 32B-J of the Service Employees International Union ("the Union").

That lengthy arbitration concluded when Arbitrator John L. Anner issued his Opinion and Award on October 11, 2007. On December 14, 2007, Columbia filed its Notice of Motion for Summary Judgment -- including the Declaration of Mark A. Hernandez, Esq. and Affidavits by Nelson Falcon and Timothy O'Keefe. Mr. Hernandez's declaration described and annexed Exhibits A through Q; I shall refer to certain of those exhibits as "Def. Exh. ___." At the same time, Columbia filed Defendant's Memorandum of Law ("Def. Mem.") and Defendant's Statement of Undisputed Material Facts ("Def. 56.1").

Six days later, Ms. Hayes filed her Notice of Appearance. On February 7, 2008, Ms. Hayes filed (a) a Response in Opposition consisting of the Declaration of Pamela D. Hayes, which annexes Exhibits 1-9 ("Pl. Exhs.") and the Affidavit of Ray Hodge, (b) a Memorandum of Law ("Pl. Mem.") and (c) a Counter Statement in Opposition to Defendant's Rule 56.1 Statement ("Pl. 56.1").

On February 21, 2008, Columbia submitted a Reply Memorandum ("Reply Mem.").

During the lengthy stay, plaintiff made a _pro_ _se_ motion for

leave to file an amended complaint. (Docket Item # 10, filed March 8, 2006.) However, that motion was withdrawn by Ms. Hayes on February 7, 2008. (See Pl. 56.1 ¶¶ 75-76, and Pl. Mem. p. 14.)

Having considered the submissions of both parties, I now recommend that Judge Kaplan grant Columbia's motion for summary judgment.

<u>FACTUAL BACKGROUND</u>

Hodge began working for Columbia in 1987 as a porter. In 1988, he was permanently assigned to 610 West 116th Street in Manhattan ("610"); he worked there and at an adjoining building (606 West 116th Street, "606") until he retired in 2005.

During his entire time at Columbia, Hodge was a member of the Union; thus, his employment was governed by a collective bargaining agreement (the "CBA," Def. Exh. G) between the Union and the Realty Advisory Board of Labor Relations Incorporated (the "RAB"). [2]

As a result of a work-related injury in June 2002, Hodge was out on Disability Leave under Workmen's Compensation from July 1, 2002 to December 9, 2002, and from late December 2002 to September 17, 2003. (Pl. 56.1 ¶¶9-10 43.) On January 25, 2005,

---

[2] Columbia was and is a member of the RAB for purposes of collective bargaining and arbitrations under the CBA. (Def. Mem. p. 3, n. 3.) Therefore, I disagree with Ms. Hayes's comment that "Plaintiff should also have included the [RAB] as a defendant." (Pl. Mem. p. 14.) If RAB had been included as a defendant, my analysis would be unaffected.

he had surgery for a torn Achilles tendon that was not work-related; he was again out on "disability," and he never returned to work before retiring on July 6, 2005. (See Pl. 56.1 ¶ 13.) At Pl. 56.1 ¶¶ 14-15, he concedes that he was "not terminated," but asserts that he "resigned under duress." Despite that assertion, all the evidence indicates that Hodge chose retirement over termination, the only two options available to him given his medical condition and the time limit on medical leave provided in the collective bargaining agreement. This is set forth in Def. Exh. M, a series of letters between Columbia and Hodge beginning on February 21, 2005:

> ... Since your current leave began on January 24th, 2005, we can hold your position open until April 15th, 2005. ...
>
>          *         *         *
> ... Following our discussion on April 20th, I contacted the human resources department at Columbia and my Union representative .... I do meet the requirements to retire. In addition I consulted with my physician .... His evaluation is that I am not able to return to work. ...
>
>          *         *         *
> Pursuant to our conversation today, the purpose of this letter is to formally request that I be retired from Columbia University effective July 11, 2005 by which time I will be 62 years old.
> My medical situation dictates this request. ....

Hodge was directly supervised by the Superintendent of his buildings. During Hodge's employment, the adjoining buildings at

606/610 shared a single Superintendent -- Jose Baez for the first
13 years, Dave Suso for a few months, followed by Roberto
Gorritz, and then Alejandro (Alex) Figueroa from 2002 on.  Above
the Superintendent was an Area Housing Supervisor (also known as
an Area Manager) –- Peter Hoff, then Nelson Falcon, then Timothy
O'Keefe from November 2001 through 2004.  After O'Keefe left,
Falcon took over for a second time.  Most of Hodge's complaints
are against O'Keefe. [3]

The CBA (Def. Exh. G) sets forth a 3-step grievance process
to be used by any employee who wants to contest discipline
decisions, or who believes an employer has violated the CBA.
(Def. Exh. G, Art. V, at pp. 12-14.)  If the grievance process
rules against the employee, then he, through the Union, may
submit the grievance to arbitration.  (Def. Exh. G, Art. VI, at
pp. 14-18.)  The CBA includes the following provision in Article
XVII:

> Section 23, "No discrimination"
>
> There shall be no discrimination against
> any present or future employee by reason of

---

[3] Throughout the arbitration Plaintiff said he was harassed by the area
Manager, Mr. O'Keefe.  Plaintiff disputes Columbia's statement in Def. 56.1
¶10 that "Considering Plaintiff's leave of absence, and the fact that O'Keefe
was plaintiff's manager from only November 2001 until December of 2004, the
total time [he] was supervised by O'Keefe was less than two years."  Pl. 56.1
¶ 10 contends that "although Plaintiff was [out] on work related injuries
during portions of this time period, he still had to interact with his
manager, Mr. O'Keefe, who made decisions on Plaintiff's leave and designation
during this period."  Arbitrator Anner wrote: "The total time the Grievant was
supervised by [] O'Keefe during O'Keefe's tenure was less than two years."
(Def. Exh. K, p. 19.)

race, creed, color, age, disability, national
origin, sex, union membership, or any
characteristic protected by law, including,
but not limited to, claims made pursuant to
Title VII of the Civil Rights Act, the
Americans with Disabilities Act, the Age
Discrimination in Employment Act, the New
York State Human Rights Law, the New York
City Human Rights Code, or any other similar
laws, rules or regulations. [4]  All such
claims shall be subject to the grievance and
arbitration procedure (Articles VII and VIII)
as sole and exclusive remedy for violations.
Arbitrators shall apply appropriate law in
rendering decisions based on claims of
discrimination.

## PROCEDURAL HISTORY

Hodge's complaints to the New York State Division of Human
Rights ("NYSDHR") and the U.S. Equal Employment Opportunity
Commission ("EEOC").

On December 3, 2003, Hodge filed a Verified Complaint with

the NYSDHR alleging violations of both the New York State Human

Rights Law and Title VII "because of Age, Race and Color."  At

that point, he had returned to work after being on disability

leave for almost the entire time from July 1, 2002 to September

17, 2003.  In his administrative charge he stated:

The particulars are:

1.  I am Black and I am 60 years of age
(d.o.b. 7/6/42).

---

[4]  In quoting this provision from the CBA, Def. Mem., Def. 56.1 and
Falcon Aff. ¶10 each state that the CBA also covers claims pursuant to 42
U.S.C. §1981 and the Family and Medical Leave Act.  I have quoted the version
of the CBA in Def. Exh. G, entitled "2003 Apartment Building Agreement . . .
Effective April 21, 2003 to April 20, 2006."  That is the only copy of the CBA
in the record before me.  For purposes of this motion, it is immaterial
whether the CBA also stated that arbitration was the sole and exclusive remedy
for violations of 42 U.S.C. § 1981 and the Family Medical Leave Act.

2. On or about 1987 I was hired by
respondent as a Porter. My work performance,
time and attendance are satisfactory.

3. I have been the target of undue
harassment by my Supervisor, Timothy O'Keefe,
Asian, in his 30s, for the past two years.
He has given me warnings for incidents which
I consider to be unfair.

4. On or about April 2002, Mr. O'Keefe
threatened to fire me because I did not agree
with the changes he was making in the break
times and lunch hours. He did this in front
of the Union Representative, John Greer,
Black, and other employees.

5. Based on the foregoing, I charge the
respondent with an unlawful discriminatory
practice related to employment for treating
me in a disparate manner because of my Age,
Race and Color, in violation of the New York
Human Rights Law Section 296.

On March 3, 2005, the NYDHR issued a Determination and Order

after Investigation (Def. Exh. D). It determined that there was

no probable cause, and wrote: "Respondent has articulated

legitimate non-discriminatory reasons for its action concerning

complainant, which reasons have not been shown to be pretextual."

Hodge requested a formal review by the EEOC (Def. Exh. E), which

adopted the NYSDHR determination and issued a "right to sue"

notice on June 16, 2005 (Def. Exh. F).

Hodge's Complaint in our Court

On August 24, 2005, Hodge (who had retired by this time)

filed his Complaint in our Court. He used the standard form for

Title VII actions provided by the Pro Se Office. He annexed a 6-

7

page narrative and copies of three letters he had written in 2002 and 2003 to Columbia officials about the way he was treated by some of his superiors.  On the <u>pro</u> <u>se</u> complaint form, he checked Title VII and the Age Discrimination in Employment Act ("ADEA").  He also checked the Americans with Disabilities Act ("ADA"), but his administrative charge had never mentioned disability, and Ms. Hayes does not oppose summary judgment on the ADA claim.  (See Pl. Mem. pp. 14-15.)

In answer to question number 4, Hodge checked termination, failure to accommodate my disability, unequal terms and conditions of my employment, and retaliation.  After "other acts," he wrote "pressure to retire/resign, hostile environment, coercion in forfeiting rights."  At number 8, he wrote:

> In early 2002 Mr. Timothy O'Keefe, assumed the position of supervisor of the building in which I am a porter (606 West 116th St NYC).  Mr. O'Keefe immediately began a campaign of ha[]rassment, discrimination, and retaliation.  I have been subjected to this treatment directly from Mr. O'Keefe and, at his direction, from the building superintendents who reported to him.  The attached document outlines and supports the facts of my claim.  Attached exhibits are intended to be a part of this claim.

His 6-page attached document ("Supp.") repeats the allegations in the grievances previously filed by his Union.  He emphasizes one incident that occurred on October 16, 2003.  Hodge describes it this way at Supp. p. 1:

> While the treatment I have received

began immediately upon Mr. O'Keefe's taking over . . ., it escalated after I made management aware of my concern about asbestos in the basement.  I felt that these were valid concerns given the fact that asbestos had been found in a previous inspection.  I simply requested that professionals check the location before I continued to work in that area.  This request was immediately met with attempts to coerce (threats of suspension and firing) me into continuing the work.

Nelson Falcon (the Area Supervisor who preceded and succeeded O'Keefe) gives the following version of this incident:

[Hodge refused] to clean out the basement meter room ... and advised an outside contractor not to enter the room due to his belief that asbestos existed in the basement....  An independent licensed contractor confirmed that the basement did not contain asbestos.  Mr. Hodge based his belief [on his knowledge that] an asbestos abatement was performed ten years earlier.  However, [he] was aware that the asbestos found in 1993 was abated by ... an asbestos removal company.

(Falcon Aff. ¶¶17-22.)  Arbitrator Anner wrote:  "On [this] grievance[] giving the Grievant the benefit of the doubt [it] should be rescinded but as he is no longer an employee the issue is moot." (Def. Exh. K, p. 23.)  The Arbitrator was certainly not giving a ringing endorsement of Hodge's 10/16/03 conduct.  Moreover, this incident resulted in no economic discipline.  Seven days later, O'Keefe listed this incident (along with others) in a 10/23/03 memorandum (Def. Exh. L) warning Hodge about "insubordination."  The Arbitrator rejected an allegation that O'Keefe had made remarks about Hodge's age, and there is no

allegation that any supervisor ever made any comment about Hodge's race or color.

Hodge's Complaint also makes the following allegations:

1.  Mr. O'Keefe "flatly told Mr. Figueroa that he would not order the requisite uniform jacket" for me. (Supp. p. 1.)

2.  "Almost immediately [after O'Keefe's arrival in November 2001] Mr. [Roberto] Gorritz began a campaign of harassment instigated by Timothy O'Keefe. The harassment continued when Mr. Gorritz subsequently left the position [as my immediate superior] and was replaced by [Mr.] Alex Figueroa."  (Supp. p. 2.)

3.  O'Keefe "has refused on more than one occasion to talk with me to resolve questions that I have brought to his attention."  And O'Keefe "has been totally dismissive of the union, threatening me in the presence of my representative, ignoring telephone calls and requests."  (Supp. p. 2.)

4.  "[O'Keefe] has told me on more than one occasion that if I didn't like what he was saying to complain to my union.  The implication being that there is nothing the union can do about it."  (Supp. pp. 2-3.)

5.  After returning from disability leave in 2003, "I have been forced to provide porter service for two buildings (606 and 610) on Fridays."  (Supp. p. 4.)

6.  "I have been continually asked to work with cleaning products and chemicals that are dangerous and require special handling.  I brought this to the attention of management and was either offered dust masks, which are not [suitable] for fumes and sprays, or written up for insubordination when I use other products that are not dangerous and do an equal or better job of cleaning."  (Supp. p. 4.)

Regarding the claim of disparate treatment, Hodge alleges, at pp. 4-6:

(1) That no "other porters" were asked to combine two

10

15-minute breaks into one daily 30-minute break.

(2) That "Mr. Gorritz demanded that I provide a minute-by-minute breakdown of how I spent my day," a "request [that] was not made of other porters."

(3) That O'Keefe denied part of Hodge's vacation request for his 2004 vacation and stated that Hodge should speak to him about this only through his union representative. "This is not a requirement of any other employee."

(4) That O'Keefe favored another employee with less seniority in approving a vacation request for the time frame he had denied to Hodge.

(5) That O'Keefe refused Hodge's request to take off Monday July 5 and Tuesday July 6, 2004 (Hodge's birthday [5]), but granted another employee's request for July 4 and 5.

Motion to Amend the Complaint

On March 3, 2007 (while the arbitration was proceeding and the stay in our Court was still in effect), Hodge filed a Motion to Amend the Complaint. (Def. Exh. N.) His proposed pro se amended complaint (13 pages plus 26 exhibits) (a) added allegations that Columbia had violated the Occupational Safety and Health Act, 29 U.S.C. §§651, *et seq.* ("OSHA"), (b) claimed "whistleblower" status under OSHA, and (c) sought to add O'Keefe and William Scott as individual defendants. However, that motion was withdrawn in February 2008 by Hodge's attorney.[6]

_____

[5] According to Hodge, employees were allowed to take their birthday off. (Def. Exh. A, Supp. p. 5.)

[6] In Pl. Mem. at p. 14, Ms. Hayes writes:

    Plaintiff would not amend its complaint to
    include the OSHA claim nor the claim against Mr.

<u>A Review of the Lengthy Proceedings under the CBA</u>

<u>Hodge's grievances</u>

On January 13, 2004, Hodge filed a grievance; it was presented on his behalf by the Union in a letter to the RAB (Def. Exh. H).  The Union stated, in part:

> We are claiming removal of the warning letter from his file, reimbursement for the hours that were unjustly deducted from his pay, vacation pay for 2001 and 2002, [and] the area housing manage[r] be cited for harassment and for harassment to stop.
>
> The employer has failed or refused to adjust this matter; therefore [we request that] the dispute be set down for a hearing before the Joint Industry Grievance Committee.

Subsequently, the Union submitted seven more letters, adding seven amendments covering eleven additional allegations of unjust discipline and purported contract violations.  (See Def. Exh. H.)  The last amendment was on January 12, 2006.  Those amendments to the January 2004 grievance can be summarized as follows:

10/7/04  (1) Did not receive 2 weeks vacation pay, and

　　　　　2) was forced to take a full day off for a doctor's appointment when he only asked for three hours off.

10/20/04  Unjustly suspended for four days

_____

O'Keefe and Mr. Scott as individuals . . .  These cases do not support individual defendants. Consequently, Plaintiff will withdraw its motions to amend certain individual defendants and causes of actions outside Plaintiff's Civil Right[s] claims based on Racial Discrimination and Age Discrimination.

for refusing Figueroa's instruction
                    to work the Columbus Day holiday.

10/29/04    Was not paid for the week ending
            10/22/04.

11/30/04    Did not receive vacation pay from
            11/18/04.

1/10/05     During week of 12/20/04 to
            12/26/04, he worked 40 hours but
            was paid for only 8.

1/12/06     Columbia

            (1) impermissibly deducted 40 hours pay
                from his 12/29/04 check, and

            (2) did not pay him for a salary adjustment
                made in September 2004, and

            (3) did not pay him for Christmas Day 2004
                and New Year's Day 2005.

## The Arbitration Hearings

Meanwhile, on August 16, 2004 arbitrator John L. Anner
began arbitration hearings, which continued intermittently until
February 14, 2007. [7]  Columbia was represented by an attorney
provided by the RAB; the Union provided counsel for Hodge. [8]
Over the course of the 17 hearings, seven witnesses testified,
and 62 documents were received in evidence.  Each party submitted
a post-arbitration brief.  (The Union Brief is Def. Exh. I and

---

[7] The arbitrator's hearings took place on: 8/16/04, 11/17/04, 5/4/05,
7/14/05, 9/28/05, 9/29/05, 12/8/05, 1/11/06, 1/30/06, 3/13/06, 5/12/06,
7/10/06, 7/14/06, 8/9/06, 10/4/06, 10/18/06 and 2/14/07.

[8] It appears that on occasion each party was accompanied by one or more
other lawyers, although the parties dispute the importance of these
"consulting" attorneys, who apparently did not take part in the questioning of
witnesses.

the RAB brief is Def. Exh. J.)

The Union's position was that O'Keefe's desire to harass Hodge was manifest both in the unjust disciplinary measures and in the pay check problems. Columbia's basic response was that Hodge had worked for 13 years for a very lenient superintendent and lenient Area Managers, who were then replaced by Superintendent Gorritz and Area Manager O'Keefe, who confronted all the porters with stricter enforcement of rules and a more demanding management style. In particular, the RAB brief for Columbia contended:

> (1) The disciplines were justified by Hodge's behavior.

> (2) O'Keefe was not the only object of Hodge's complaints (see Def. Exh. N, letters from Hodge attached to his proposed amended complaint).

> (3) O'Keefe had no control over Columbia's payroll system. The pay check problems were simply either (a) inadvertent errors, or (b) the product of confusion caused in 2004 by revamping of the payroll system (see Def. Exh. J, p. 9). Moreover, all the errors were corrected so that Hodge ultimately received all the pay due him. [9]

> (4) There was no support for an allegation that O'Keefe singled out Hodge for disparate treatment.

> (5) Columbia was, in fact, generous to Hodge by allowing him to remain on the payroll until July 2005, at which point he became eligible to retire. Columbia did this even though (a) Hodge had exhausted his medical leave as of April 2005, and (b) in a letter

---

[9] Columbia contended that other errors were not corrected and resulted in a windfall to Hodge -- he retained money that should rightfully have been recouped by Columbia. (Def. Exh. J, pp. 9-11.) However, Arbitrator Anner rejected that contention. (Def. Exh. K, pp. 26-27.)

dated April 28, 2005, Hodge's doctor, Stuart D. Katchis, M.D., stated "I am not optimistic that he will be able to return to work in his function as a porter until the end of this year."  In addition, even though Hodge did not come to work at all after mid-January 2005, Columbia paid him for the number of vacation days he would have accumulated if he had worked all of 2005. (See Def. Exh. M, correspondence between Columbia and Hodge.)

The Arbitrator's Opinion and Award

On October 11, 2007, Arbitrator Anner issued his 27-page Opinion and Award. (Def. Exh. K.)  Mr. Hernandez and Ms. Hayes differ in their characterizations and interpretations of various segments of the Opinion.  To avoid getting mired in semantics, I will quote the Opinion at length.  At pages 1-19, Arbitrator Anner summarized the proceedings and outlined the positions of each party.  He then began his analysis, which I now quote (with my emphases in bold type):

1.  The Harassment Charge

The one issue that permeated through out the entire hearing process was the constant charge that the Grievant was harassed by the Employer.  In particular, the Manager Timothy J. O'Keefe.  It should be noted at this point that O'Keefe only was the Grievant's manager from November 2001 until December of 2004.  During that time the Grievant was on a medical leave of absence from July 1, 2002 until December 9, 2002 and late December until September 17, 2003.  The total time the Grievant was supervised by O'Keefe during O'Keefe's tenure was less than two years.

The Union points to the many discipline actions taken by the Manager O'Keefe and the fact that there was no prior discipline in his file for most of the Grievant's 17 years of employment.  The union also argues that there were an unusual number of payroll problems with the Grievant.  He had more problems with his pay checks and was constantly having adjustments

being made **he was not only under paid but often overpaid and recoupments were made.**  Even the Union Delegate John Grier testified that none of the other 300 employees at Columbia had as many payroll adjustments, etc.  He also testified that O'Keefe told him he wanted to fire the Grievant for failing to clean the building and otherwise not doing his job.  The Delegate did not think the charges were justified according to his own observations.  He also testified regarding the suspensions that he thought they were unfair but admitted that the Grievant did not do as he was told.  In response to a direct question he said he did not think O'Keefe treated the Grievant fairly.  Yet on cross-examination he admitted that **the Grievant was allowed to return from a medical leave after 14 months while he was only entitled to 12 months leave under the Agreement.  The Grievant was also allowed to return on light duty which is generally not permitted.  The Employer demonstrated that there were also other areas where the Delegate agreed that the Grievant was given consideration that was not allowed by a strict application of the Agreement.**

The Grievant also wrote two letters complaining about his Superintendents, the first April 15, 2002 . . . to Mr. Falcon where he complains about his new Superintendent Mr. Gorritz who had made demands that he combine his two daily 15 minute breaks into a once daily 30 minute break and that he was to produce a schedule stating the times of day he would be engaged in specific activities.  These issues were resolved after they had a meeting with the union delegate.  The second letter to Union Delegate John Grier is dated February 8, 2004 and complains about his then Superintendent, Figueroa.  These letters are noteworthy since they demonstrate as argued by the Employer that the Grievant had problems with other supervisors as well as O'Keefe.

While it is true that the Grievant had a number of payroll issues there is no evidence that O'Keefe was responsible for his payroll problems.  There was a lot of confusion about the new salary system that was put into effect and it is clear the employer could have done a better job of explaining it to the employees. There is also no rational explanation why the Grievant was either under paid or over paid and then the money

recouped on so many different occasions.

It is also true that according to the testimony of several witnesses Timothy O'Keefe was a "by the book" supervisor who was firm in his dealing with the employees. This was in contrast to the prior supervisors of the Employer who were characterized by Union Delegate, John Grier, as "Quite liberal" in their dealing with the employees. **I find no support in the record for the allegation that O'Keefe asked about the Grievant's age and why he did not retire.** These allegations were denied by O'Keefe in his testimony. True he did say he wanted to fire the Grievant but for not performing his job.

After reviewing all the testimony as well as documents submitted by the parties **I do not find that the Manager Timothy O'Keefe harassed the Grievant.** Rather I believe that the comment made by the Employer in its brief on page 12 is accurate "Hodge and O'Keefe did not get along from the start and each found the other unreasonable and uncooperative."

A failure to agree does not amount to harassment.

2.  The discipline charges.

The Grievant has charged that he was unjustly warned and suspended on several occasions.

On May 20, 2002, he received a warning letter for going to payroll to ask about why he had not received his paycheck. He had spoken to Mr. O'Keefe and he refused to help the Grievant so he went directly to payroll and inquired why he was not paid and all other employees were. The fact is that he was told to contact his Superintendent Mr. Gorritz and not payroll which he did not do. He admits he was specifically told not to contact payroll but insists he had a right to inquire why he was being treated differently. Refusal to obey a directive of management is insubordination.

On October 23, 2003, he received a warning for his refusal to clean the basement area and telling the contractors in the area that there was asbestos in the area which ultimately proved untrue. The Employer claims he was warned for just cause but admits he has a

right to refuse if he feels his safety is compromised. On November 18, 2003, the Grievant received a warning for failing to call in before an absence.  Here the Grievant testified that he did call in on time.   On both these grievances giving the Grievant the benefit of the doubt, they should be rescinded but as he is no longer an employee the issue is moot.

The next letter was dated August 17, 2004 and was a warning and suspension of 2 days for the Grievant failing to follow a directive not to leave the building for his Arbitration until 1:00 p.m. [T]he hearing was scheduled for 3:15 p.m.  The Grievant claims that he was originally told he could leave at 11:00 a.m.  The Employer agrees that was true but says it was changed. **The Grievant admits this but said it was unfair.  He may be right but he clearly refused to obey the instructions and left at 11:00 a.m.  This grievance is denied.**

The final discipline was a warning and suspension issued on October 12, 2004.  Here the Grievant was told to work on the Columbus Day Holiday.  He told his supervisor that he never works on holidays and he has the right due to his seniority.  This was discussed at a meeting with his Superintendent, Figueroa and John Grier, Union Delegate.  The Supervisor said he must work due to coverage issues.  He refused and then called in sick.  At the hearing, John Grier testified that the Grievant told him he had another commitment. **This is another example of the Grievant being unwilling to cooperate and refusing a reasonable request of his Superintendent.  This suspension [of 3 days] was for just cause and the grievance is denied.**

3.  The wage issues.

As stated above, there were a number of wage issues where the Grievant claims that he was there was an improper deduction of 38 hours pay for the week ending October 22, 2003.  The Employer was able to demonstrate that the Grievant was paid for that week [in July 2002] while he received compensation payments [from Workmen's Compensation].  The Grievant claimed that by deducting this week from his wages in October the Employer caused him to lose compensation payments but was never able to demonstrate how.

He also claims he was not paid for the week ending October 22, 2004, but at the hearing it was explained that he was suspended for three days and he was compensated for the other days or did not work them. There are claims that he worked the week of December 19, 2004 but was only paid for 8 hours.  He also claims that he worked 8 ½ hours overtime and was not paid. The Employer was able to demonstrate at the hearing that the Grievant was paid for all time worked as well as for his December vacation.

Another claim was that the Grievant was not paid for the July 4th Holiday.  The Employer demonstrated that he was in fact paid for that date on his December 10, 2004 paycheck.  The Grievant agreed to this at the hearing but refused to drop the claim.

4. <u>The vacation carry over and unpaid holiday issues</u>.

These two issues are considered together since the Employer admits that the Grievant was not paid for either the so called "carry over" vacation or the Christmas holiday in 2004 and the New Year's Day holiday in 2005.  The Grievant is claiming that he is entitled to 10 days accumulated vacation that he was unable to use and normally allowed to carry over into the next year.  He was denied the right to carry over the vacation as it was contrary to the Agreement and against policy.  The testimony at the hearing from the witnesses for the Union as well as management indicated that it was a practice at that time to allow employees to carry over their unused vacation into the next year. The Employer claims that both issues are time-barred and the Union has offered no good reason why the time limits should be extended.

The Grievant failed to file timely grievances on the issue of the 10 days carry over vacation and the denial of holiday pay for Christmas 2004 and New Years Day 2005.  The Employer does not deny he was not compensated for both.  The issues were raised in a timely fashion with the management and were denied despite past practice to carry over the vacation and an agreement by the Employer to look into the holiday pay. I believe in this instance that the Union has shown good cause to extend the time limits on this limited basis.  The Grievant should be compensated for both the 10 days vacation claimed as well as the Christmas

Holiday of 2004 and New Years Holiday for 2005.

Regarding the Employer's claim of an offset due to alleged overpayments it is denied. The basis for this denial is that most but not all of the confusion as to the Grievant's pay, paychecks, holiday pay, etc. is due to mistakes and errors made by Employer's payroll department. The Employer cannot now claim a recoupment when the confusion was originally caused by its own errors.

(Def. Exh. K, pp. 19-27, with my emphases.)

## LEGAL DISCUSSION

Summary Judgment Standard

Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2508 (1986). The trial court's function at this stage is to identify issues to be tried, not decide them. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 106 S.Ct. at 2511 (internal quotation marks and citations omitted.) The Second Circuit has advised caution when evaluating employment discrimination cases under the summary judgment standard because such cases often turn on a finding regarding the employer's intent. Nonetheless, "summary judgment

remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001.)

The Claim of Age Discrimination under the ADEA.

The ADEA only allows recovery for economic losses. The Second Circuit has held that the ADEA does not allow recovery for emotional damages, and that relief under the ADEA is limited to "back pay, liquidated damages, and injunctive relief such as reinstatement." *Johnson v. Al Tech Specialties Steel Corp.,* 731 F.2d 143 [, 148] (2d Cir. 1984); *Haskell v. Kaman Corp.*, 743 F.2d 113 ([, 120-21] (2d Cir. 1984). Accord: *Meyers v. I.B.M. Corp.*, 335 F.Supp.2d 405, 411 (S.D.N.Y. 2004)(Robinson, J.): "the ADEA does not allow plaintiffs to recover for emotional distress, pain and suffering, or any other type of non-economic damage."

In Hodge's case, there was no economic damage except for the 2-day suspension in August 2004 and the 3-day suspension in October 2004, and the Arbitrator upheld both of those suspensions. (Def. Exh. K p. 14.) If Judge Kaplan finds that Hodge has nevertheless made a prima facie showing of economic damage under the ADEA, then he would proceed to analyze the claim of disparate treatment motivated by Hodge's age, using the

21

"burden-shifting" formula described in the next section.

<u>The Claim of Race and Color Discrimination under Title VII</u>

Title VII prohibits an employer from discriminating against an employee because of race, color, sex, national origin, or religion.

As noted above, Hodge includes a "disparate treatment" charge in his supplemental narrative.  A disparate treatment claim is subject to the "burden-shifting" formula enunciated by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089 (1981), and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-11, 113 S.Ct. 2742 (1993).  In *Collins v. New York City Transit Authority*, 305 F.3d 113 (2d Cir. 2002), the Second Circuit summarized that approach:

> In an employment discrimination case, a plaintiff has the burden at the outset to prove "by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  To meet this burden, a plaintiff must show: (i) membership in a protected class; (ii) qualifications for the position; (iii) an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999); *Chambers*, 43 F.3d at 37.

In *St. Mary's*, the Supreme Court characterized the

plaintiff's initial burden (the four elements of a *prima facie* case) as "minimal." 123 S.Ct. at 2746-47. Nonetheless, a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37-38 (2d Cir. 1994). If plaintiff makes out a prima facie case, then the employer must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action. *St. Mary's*, 113 S.Ct. at 2747 (emphasis in original). The employer's burden "is also not a particularly steep hurdle." *Johnson v. County of Nassau*, 480 F.Supp.2d 581, 594 (E.D.N.Y. 2007). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2097. Moreover, it is not the court's role to second-guess an employer's personnel decisions. "[A]n employer can set whatever performance standards he wants, provided they are not a mask for discrimination on forbidden grounds such as race or age. He can set unrealistic standards and fire an employee for not being able to meet them." *Hunter v. St. Francis Hospital*, 281 F.Supp. 534, 545 (E.D.N.Y. 2003)(citations and quotation omitted).

Hodge easily meets the first two criteria required for the *prima facie* case: he is in a protected class and he was qualified

for the porter job.  However, he runs into problems with the

third -- whether the actions against him were sufficient to

qualify as "adverse employment actions."   To constitute an

"adverse employment action" in a discrimination claim, the

employer's action must be "more disruptive than a mere

inconvenience or an alteration of job responsibilities."

*Terry*, 336 F.3d 128, 138 (2d Cir. 2003)(citation omitted).

"**[R]eprimands and close monitoring** may cause an employee anxiety,

but such intangible consequences are **not materially adverse ....**"

*Delena v. Verizon New York, Inc.,* 2007 WL 2973583 at *14

(W.D.N.Y. 2007)(Curtin, J.)(emphasis added).  And even if Hodge

could satisfy the third element, there appears no basis to

satisfy the fourth element, namely, evidence of circumstances

giving rise to an inference that the "adverse employment action"

was motivated by an intent to discriminate against Hodge's race

or color or age.  Hodge does not allege that any of his

supervisors made any remark about his race or color.  He alleges

that O'Keefe made remarks about his age; however, the Arbitrator

specifically rejected that allegation.

In our Court, as he did at the arbitration hearing, Hodge

accuses O'Keefe of harassment.  In the Title VII context,

harassment may be actionable, but only if (a) it is so severe

that it rises to the level of creating a "hostile environment,"

and (b) it is motivated by an intent to discriminate against the

employee's race or color.  A hostile work environment claim involves

> objective and subjective elements: the
> misconduct must be 'severe or pervasive
> enough to create an objectively hostile or
> abusive work environment,' and the victim
> must also subjectively perceive that
> environment to be abusive. . . . As a general
> rule, incidents must be more than episodic;
> they must be sufficiently continuous and
> concerted in order to be deemed pervasive.

*Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)(quotations and citations omitted).  Moreover, a "hostile environment" claim under Title VII requires a showing that the conduct occurred because of plaintiff's membership in a protected class.  See *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999).  Abusive conduct in the workplace, if not based on a protected class, is not actionable under Title VII.  *See Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 81, 118 S.Ct. 998 (1998).  Thus, Hodge has failed to make even the "minimal" prima facie case.

<u>Effect of arbitration award on summary judgment motion</u>

In *Alexander v. Gardner-Denver Company*, 415 U.S. 36, 94 S.Ct. 1011 (1974), the Supreme Court held that a negative arbitration decision does not preclude a Title VII action but "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate."  415 U.S. at 60, 94 S.Ct. at 1025.  *Collins* v. *New York City Transit Authority*, 305

F.3d 112 (2d Cir. 2002), demonstrated than an arbitral decision may be so weighty in particular circumstances that summary judgment should be granted to the employer. In *Collins*, the employee claimed that his termination was discriminatory and retaliatory. The Second Circuit affirmed summary judgment for the employer, and relied heavily on an arbitrator's finding that plaintiff Collins had assaulted a supervisor. The Second Circuit analyzed the interplay among the *Alexander* holding, the standard for summary judgment, and the elements of Title VII liability:

> . . . [The employee] argues that the district court erred in holding that there was legally insufficient evidence that his termination was discriminatory or retaliatory. We disagree. Where an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive. In light of the arbitration decision and the other evidence proffered, appellant cannot establish that link on this record.

>    *    *    *

> Generally speaking, a plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is "minimal." However, appellant has not met even this low threshold, because the circumstances of his termination do not give rise to or support an inference of discrimination or retaliation. Appellant challenged the Transit Authority's decision to fire him and was finally discharged only after the arbitration board made an independent inquiry, including the taking of evidence, and authorized termination because

it found that appellant had assaulted Badr.
Appellant does not suggest that the
arbitration board was not a fully independent and unbiased decisi
termination or that his claims of bias and of Badr's faking an
assault was not fully aired before the board. . . .

Moreover, there is no claim that the
arbitration board rubberstamped the
recommendations of appellant's supervisors.
First, the CBA established this process . . .
to ensure fair and probatively sound
decisions for aggrieved employees. Second,
the arbitration board conducted three days of
hearings, at which appellant was represented
by his union and evidence was received.
Thereafter, the arbitration board issued a
reasoned fourteen-page opinion, concluding
that . . . appellant should be discharged for
the assault.

. . . . While appellant may have
proffered (barely) enough evidence to create
an issue of fact over whether Badr faked the
assault for discriminatory or retaliatory
purposes, that proffer is not sufficient to
overcome the additional probative weight of
the arbitration award allowing his termination.

*Collins*, 305 F.3d at 115, 118-120.

Columbia's 12/13/07 memorandum of law cited *Gallimore-Wright
v. Long Island Railroad* Co., 354 F. Supp.2d 478, 491 (S.D.N.Y.
2005). In that Title VII case, Judge Kaplan granted summary
judgment to the employer. He relied heavily on the fact that the
employer's disciplinary charges were upheld after an
administrative trial, a proceeding that was analogous to the
arbitration proceeding in *Alexander*:

In this case, the allegedly retaliatory
disciplinary charges were tried before a
trial officer. Plaintiff was represented by
the chairman of her union. The trial

27

decisions went against her.  Her appeals to
the highest public authority in the LIRR were
unsuccessful.  Public Law Board No. 6495 -- a
three person panel consisting of
representatives of the LIRR and the union and
a neutral member -- unanimously upheld the
dismissal. . . .

In *Alexander v. Gardner-Denver Co.*, 415
U.S. 36, 94 S.Ct. 1011 (1974), the Supreme
Court held that a negative decision does not
preclude a Title VII action although "it may
be admitted as evidence and accorded such
weight as the court deems appropriate."  In
consequence, the disciplinary decisions in
plaintiff's cases are not inherently
conclusive.  But they are very far from
immaterial, even on a motion for summary
judgment.

Judge Kaplan went on to discuss *Collins,* and he wrote the

following passage, which rejected the same argument that is now

being made by Hodge.  Judge Kaplan wrote:

Plaintiff . . . argu[es] that *Collins*
has no impact here because she did not
present her discrimination and retaliation
evidence in the disciplinary trial.  But that
is entirely beside the point.  There is no
suggestion in *Collins* that the plaintiff had
presented his evidence of discriminatory and
retaliatory intent to the arbitrator.
Certainly the Circuit did not rely on any
findings by the arbitrator with respect to
any such claims.  And this makes good sense
in light of what the Circuit did say.  Its
point was that the arbitration decision
finding that the plaintiff assaulted his
supervisor and was properly terminated was
strong evidence of a lack of retaliatory or
discriminatory intent which, in the absence
of any meaningful proof to the contrary,
prevented the plaintiff from making out a
prima facie case.  **Accordingly, plaintiff's
failure to present discrimination and
retaliation evidence in the disciplinary**

28

> **trial does not affect the *Collins* analysis,**
> which leads to dismissal of the retaliation
> claim based on the August 2 charge. [10]

*Gallimore-Wright*, 354 F.Supp.2d at 491-92 (emphasis added).

In my 12/21/07 Memorandum and Order (Docket Item # 24), I

wrote:

> On December 19, 2007, [Ms. Hayes] served a
> Notice of Appearance for Mr. Hodge and I held
> a telephone conference with her and with
> defense counsel Mark Hernandez, Esq.  I
> issued the following rulings.
>
> I denied Ms. Hayes's request to file
> discovery requests at this stage. . . .  In
> [her opposition] papers, Ms. Hayes is free to
> invoke Rule 56(f) and to explain what
> discovery was unavailable during the lengthy
> arbitration commenced by Mr. Hodge.  Ms.
> Hayes is also free to include a proposed
> Amended Complaint.  However, in my view, her
> main task is to meet the argument based on
> *Collins v. City of New York Transit Auth.*,

---

[10] Immediately before this passage, Judge Kaplan inserted footnote 79:

One might question the Court of Appeals' reasoning in *Collins* to a limited extent.  A plaintiff is entitled to recover on a discrimination or retaliation claim if the discriminatory animus or retaliatory motive was a substantial or motivating factor in the employment decision.  *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).  Even if a proscribed motive was a substantial factor, however, the employer still prevails if it proves that it would have made the same decision even in the absence of the proscribed motive.  *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 180 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion)).  This Court agrees that the decision of an independent arbitrator upholding a termination or other adverse employment action should be conclusive, in the absence of strong evidence that the decision was wrong, on the issues of whether the employee was guilty of misconduct and whether that misconduct warranted termination.  The existence of misconduct, even serious misconduct, however, does not logically exclude the possibility that a proscribed motive was a factor in the employer's decision.  It goes much more strongly to the question whether the employee would have been terminated even in the absence of a discriminatory or retaliatory motive.  But that is not what the Court of Appeals said in *Collins*, and this Court is bound by that decision.

> 305 F.3d 113 (2d Cir. 2002), and the 28-page
> opinion of the arbitrator.

Ms. Hayes argues that our Court should accord no deference to the arbitration decision, because (a) the arbitration hearings did not focus on "civil rights claims" as such, (b) the Union lawyers told Hodge that they would "not arbitrate" his proposed "discrimination, disparate treatment and exposure to asbestos claims," and (c) that Hodge was not sufficiently protected by arranging for a second attorney (Sandra Durant, who attended many, but not all, of the arbitration sessions). (See Pl. Exh. 8.) [11]  In her memorandum at p. 3, Ms. Hayes contends:

> Plaintiff has *never sued* for an
> Arbitrator's award pursuant to Title VII or
> the Age Discrimination Act.  Plaintiff's
> lawyers, as well as the Arbitrator, made no
> mention of any civil rights ... claims, even
> though the Arbitrator could have done so
> under the Collective Bargaining Agreement.
> Consequently, Plaintiff has not received a
> final adjudication on his arbitration claims
> and they are still open.

This contention misses the point of *Alexander, Collins and Gallimore-Wright*.  True, the mere fact that an arbitration took place should not preclude Plaintiff from bringing a Title VII lawsuit.  But the arbitration decision "may be admitted as

---

[11] She also seems to be arguing that Columbia's [alleged] failure to pay Hodge the money awarded him by the arbitrator within the time period prescribed by the CBA entitles him to bring this lawsuit: "Plaintiff has not received the award and according to the Bargaining Agreement, can sue for the award."  However the CBA provision (Def. Exh. G, p. 16, Art. VI, ¶ 4) deals with suing to enforce an <u>award</u>, which is not the substance of or the relief requested in this lawsuit.

evidence and accorded such weight as the court deems appropriate." *Alexander*, 415 U.S. at 60, 94 S.Ct. at 1025.  Thus our Court looks not to the simple fact that an arbitration occurred, but looks at the substance of the resulting decision to gauge its weight.

Ms. Hayes repeats her refrain in several variations. [12]  For example, at pp. 4-5:

> Throughout the arbitration Plaintiff said he was harassed by  . . . Mr. O'Keefe.  There were never any allegations of Title VII Discrimination or Discrimination Under the Age Discrimination Act. . .  As a matter of fact, Plaintiff was told his lawyer would not argue any discrimination allegations because they did not do that type of work. ...  Thus, Plaintiff's constitutional issues under Title VII and the Age Discrimination Act were never argued.
>
> Plaintiff's grievance for unlawful harassment had nothing to do with the arguments Plaintiff makes in his Civil Complaint. . . .  None of the hearings were transcribed or taped.  Consequently, they were based on the recollection of the Arbitrator, which is contained in his opinion.
>
> *          *          *
>
> Defendant's reference to Plaintiff's complaint of harassment cannot and should not

---

[12] At pp. 10-11, she makes the following inapposite argument: " . . . Moreover, the determination of the preclusive effect of arbitration of labor grievances should be made by the arbitrator and not the courts, *Veleeus v. North Rev. Ins. Co,*, 150 A.D.2d 769, 770, 542 N.Y.S.2d 26.  Since the Arbitrator never remarked about a civil rights claims, it should be noted that the court should not interfere and credit the Arbitrator with ruling on something he did not want to decide."  But *Veleeus* was merely about an arbitrator's ability to determine the effect of an arbitration award in a subsequent <u>arbitration</u>.

> be given the same weight as Plaintiff's
> Constitutional Rights argument, since there
> never was an adjudication of these rights.
> The term harassment which the arbitrator used
> was used in its plain ordinary meaning (see
> Exhibit 11 [13]), and not in terms of a
> constitutional argument.

But Hodge does not, and cannot, deny that he alleged the same

<u>conduct</u> by his supervisors, both in our Court and in the

arbitration.  He unsuccessfully failed to persuade the arbitrator

that this conduct amounted to simple "harassment . . . in its

plain ordinary meaning."  Yet now he contends that he deserves a

second chance –- a chance to make a different "argument" to the

effect that the same conduct amounted to harassment that was

severe enough to meet the stringent requirements of the case law

under Title VII –- such as a severe or pervasive hostile

environment amounting to an adverse employment action.  This

"second chance" is foreclosed by *Collins* and G*allimore-Wright*,

unless Ms. Hayes can show that they are inapplicable because of

some special facts in Hodge's case.

Ms. Hayes does attempt to distinguish *Collins*.  At pages

11-12, she writes:

> In *Collins* ..., the Court decided due to
> the probative weight of the arbitration
> decision, [that the] circumstances of
> termination did not give rise or support an
> inference of discrimination or retaliation.
> In this particular case, the facts are

_____

[13] There is no Exh. 11; presumably Ms. Hayes meant Pl. Exh. 9, which is
the Arbitrator's decision, particularly pages 19-22, discussing the harassment
charge.

readily distinguishable.  In *Collins* the
Court was very clear to give the Arbitrator's
decision proper weight regarding the
requisite causal link between an employee's
termination and the employer's illegal motive
for purpose[s] of Title VII, ....

In this instance, no evidence was put
forth by Plaintiff, Defendant or the
Arbitrator on the issue of Plaintiff's Claim
of a Civil Rights Violation or Age
Discrimination. [14] This absence of evidence
alone, as a matter of fact, shows the issue
was not before the tribunal and therefore
compromised the entire proceeding.
Consequently, Defendant should not be
entitled to a Summary Judgment.

Subsequently, at page 13, Ms. Hayes argues:

Defendant suggests that Plaintiff's
reference to "harassment" was the root of his
receiving discipline.  Unfortunately, this
reference to harassment without more cannot
be equivalent to the claim of Harassment in a
Civil Rights Action.  Consequently, without
more definition and analysis from the
Arbitrator, it would be unfair to say this
case fits within the *Collins* mandate.

The strong evidence presented by the
Plaintiff which *Collins* requires to defeat
Defendant's Motion for Summary Judgment is
the refusal of Plaintiff's lawyers to present
this case through the lens of a
Discrimination case.  The evidence was never
presented to the tribunal; consequently he
did not rule on it.  By virtue of the fact
Plaintiff's lawyers did not move these issues

---

[14] To the contrary, evidence was put forth during the arbitration as to
whether O'Keefe commented about Hodge's age.  At page 22 of his opinion,
Arbitrator Anner specifically ruled on that issue; he wrote:

I find no support in the record for the allegation
that O'Keefe asked about the Grievant's age and why he
did not retire.  These allegations were denied by
O'Keefe in his testimony.

> forward, they were not handled in the
> tribunal and thus the Plaintiff in this
> instance could not be heard and deserves to
> have his claims heard in District Court.

But there was no indication in *Collins* that any "civil rights"

arguments were made in Collins's arbitration –- in this respect,

Hodge's case is similar to *Collins*.  As Judge Kaplan noted in

*Gallimore-Wright*, there was "no suggestion in *Collins* that the

plaintiff had presented his evidence of discriminatory and

retaliatory intent to the arbitrator."

Ms. Hayes does not allege that the arbitrator was operating

under some kind of bias or prejudice that undermined the fairness

of the arbitration or his conclusions based on the hearings.  Nor

does she offer any new evidence that would cast serious doubt on

the Arbitrator's findings.  She claims, at page 7:

> Plaintiff will demonstrate that these
> pr[]offered reasons [for the disciplines] are
> all pretextual and a way Plaintiff's
> supervisors utilize[d] to portray him in a
> poor light and to have him fired.  In this
> instance, Plaintiff was the "senior" man on
> the job.  The others were not senior to
> Plaintiff and they were being given priority
> status in terms of their job assignments over
> Plaintiff; consequently these issues go
> directly to the issue of pretext.

At page 7, Ms. Hayes cites *Norville v. Staten Island Univ.*

*Hosp.*, 196 F.3d 89 (2d Cir. 1999), but she provides none of the

specifics required by *Norville* for a finding of disparate

treatment between similarly situated employees.  See *Norville*,

196 F.3d at 95-96.

34

At page 11, Ms. Hayes writes:

> ... While there was an arbitration which
> lasted two years over 17 sessions, Plaintiff
> never had an opportunity to have a discovery
> period, not to mention the fact that he was
> saddled with being a pro se [plaintiff], when
> he filed his complaint.  Thus, Plaintiff was
> prejudiced as a result of never having his
> Civil Rights claims vetted.  Subsequently, it
> would be more reasonable to allow discovery
> to go forward since Plaintiff has not had a
> chance to fully vet matters at the
> arbitration.  Furthermore, while Plaintiff
> still does not have an Arbitrator's award,
> nor any transcript or any type of evidence in
> this case to back up any of the evidence
> relied on by the arbitrator[,] Plaintiff
> could not even present the case as a Civil
> Rights case because his lawyers refused to do
> so.

In my order, I stated:

> In [her opposition] papers, Ms. Hayes is
> free to invoke Rule 56(f) and to explain what
> discovery was unavailable during the lengthy
> arbitration commenced by Mr. Hodge.

Whether further discovery is warranted depends on the
circumstances of the particular case.

> [A]n incantation of a desire for further
> discovery will not by itself defeat an
> otherwise meritorious motion for summary
> judgment where the requested discovery is not
> reasonably likely to be of use in resisting
> the motion.  An opposing party's mere hope
> that further evidence may develop prior to
> trial is an insufficient basis upon which to
> justify the denial of the motion.

*Dixon v. Bowen*, 126 F.R.D. 483, 485-86 (S.D.N.Y. 1989)(citations

and quotation omitted).  In *Cooney v. Consolidated Edison*, 220

F.Supp.2d 241, 247-48 (S.D.N.Y. 2002), *aff'd,* 63 Fed. Appx. 579

(2d Cir. 2003), Judge Koeltl noted the criteria to consider when addressing such a request:

> . . . . It is well-established that a party resisting summary judgment on the ground that the party needs additional discovery in order to defeat a Rule 56(f) motion must submit an affidavit showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.

(citations omitted).

Ms. Hayes's submission does not make any of those four showings. Hodge attended the 17 hearing sessions. He testified himself, and he saw the testimony of six other witnesses, both on direct examination and on cross by his union attorney. And many of those sessions were attended by Sandra Durant, an attorney with considerable experience in civil rights cases. Therefore, it is not harsh to require Hodge to specify evidence that is reasonably expected to create a genuine issue of material fact.

The bottom line is there is no issue of material fact to be tried in this case. After very extensive hearings, the Arbitrator's written opinion concluded that O'Keefe did not comment about Hodge's age, that there were legitimate reasons for the two brief suspensions, and that Hodge was not subjected to "harassment" even in the plain ordinary meaning of that word. In view of the paucity of Hodge's evidence, no rational jury could

view of the paucity of Hodge's evidence, no rational jury could find that he has satisfied the elements required for a claim under the ADEA or Title VII.

### CONCLUSION AND RECOMMENDATION

Accordingly, I recommend that Judge Kaplan grant Columbia's motion for summary judgment (Docket Item # 19). As I noted above at pages 2-3, plaintiff's counsel withdrew the motion (Docket Item # 10) to file an amended complaint; I direct the Clerk's Office to note that the motion in Docket Item # 10 has been withdrawn.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy (i.e., **no later than June 19, 2008**), by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. Lewis A. Kaplan, U.S.D.J. at Room 1310, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street, New York, NY 10007. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e). Any request for an extension of time must be addressed to Judge Kaplan.

_Douglas F. Eaton_
DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, NY 10007

Dated:    New York, New York
          June 4, 2008

Copies of this Report and Recommendation are being faxed and

mailed on June 5 to:

Pamela D. Hayes, Esq.
200 West 57th Street
Suite 900
New York, NY 10019 (and also by fax to 212-980-2968)

Mark A. Hernandez, Esq.
Putney, Twombly, Hall & Hirson LLP
521 Fifth Avenue
New York, NY 10175 (and also by fax to 212-682-9380)

Hon. Lewis A. Kaplan